AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Western District of Arkansas

FILED
US DISTRICT COURT
WESTERN DISTRICT
OF ARKANSAS
Sep 19, 2023
OFFICE OF THE CLERK

In the Matter of the Search of  )
*(Briefly describe the property to be searched*  )
*or identify the person by name and address)*  )   Case No. 4:23-CM- 29
AN APPLE IPHONE, IMEI 354876501574359, LOCATED IN  )
EVIDENCE AT THE HSI TEXARKANA RESIDENT AGENT  )
IN CHARGE OFFICE IN TEXARKANA, ARKANSAS  )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the ___Western___ District of ___Arkansas___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

■ evidence of a crime;

■ contraband, fruits of crime, or other items illegally possessed;

■ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 8 U.S.C. § 1324(a)(1)(A)(ii) | Transporting Illegal Aliens |
| 8 U.S.C. § 1324(a)(1)(A)(V)(I) | Conspiracy to Transport Illegal Aliens |

The application is based on these facts:

See Affidavit

■ Continued on the attached sheet.

☐ Delayed notice ___ days (give exact ending date if more than 30 days: ___) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Jeremy T. Ridenour, Special Agent, HSI
*Printed name and title*

☐ Sworn to before me and signed in my presence.
■ Sworn to telephonically and signed electronically.

Date: 9/19/23

City and state: Texarkana, Texas

*Judge's signature*

J. Boone Baxter, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF ONE WIRELESS TELEPHONE: AN APPLE IPHONE, IMEI: 354876501574359, CURRENTLY IN THE CUSTODY OF HSI TEXARKANA RESIDENT AGENT IN CHARGE OFFICE, 3822 AIRPORT PLAZA, TEXARKANA, ARKANSAS | No. 4:23-CM-___ <br><br> **SEALED** |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION
UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE**

I, Jeremy T. Ridenour, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I am a Special Agent with the United States Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI). I am presently assigned to the HSI office in Texarkana, Arkansas. I have been employed as a Special Agent with HSI and its predecessor agency, the United States Immigration and Naturalization Service since April 2002. Prior to becoming a Special Agent, I was a United States Border Patrol (USBP) Agent for over three years. Part of my duties involves conducting criminal investigations concerning violations of the Immigration and Nationality Act, which includes transportation of illegal aliens.

2. During my employment as an HSI Special Agent, and as a Border Patrol Agent, I have participated in narcotics, weapons, bulk cash, and human smuggling/trafficking investigations which involved the use of Title III Interceptions, undercover agents, confidential informants, cooperating witnesses, physical surveillance,

**Application – Page 1**

consensual recordings, toll record analysis, search warrants, and subject interviews. Through such investigations and training, I have become familiar with the activities of narcotic and/or alien smugglers; the types and amounts of profits made by criminals; and the methods, language and terms that are used to smuggle illegal aliens, narcotics, weapons, and bulk cash, and the dealings associated with such activities.

3. I have participated in executions of search warrants and surveillance operations. I have participated in operations that have involved the arrest of individuals suspected of engaging in criminal activities. In addition, I have training and experience in debriefing defendants, informants, and other persons who have personal knowledge of narcotics, weapons, bulk cash, and human smuggling. I am familiar with the ways in which smugglers conduct their business, including, but not limited to, their methods of smuggling and transporting illegal aliens, narcotics, weapons, and bulk cash, their use of mobile telephones and digital display paging devices, and their use of numerical codes and code words to conduct their transactions.

4. This Affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

### IDENTIFICATION OF THE DEVICE TO BE EXAMINED

5. The SUBJECT DEVICE to be searched is as follows:

   a. A blue Apple iPhone wireless telephone bearing model number: unknown; serial number: unknown; IMEI: 354876501574359; and an unknown assigned telephone number, which is identified,

described, and depicted as SUBJECT DEVICE in "Attachment A" to this Affidavit, and which is currently in HSI custody in Texarkana, Arkansas, in the Western District of Arkansas.

6. The applied-for warrant would authorize the forensic examination of SUBJECT DEVICE, for the purpose of identifying and seizing electronically stored evidence, fruits, and/or instrumentalities of human smuggling and/or conspiracy to transport illegal aliens in violation of 8 U.S.C. § 1324. The electronically stored evidence sought is described more particularly in "Attachment B" to this Affidavit.

## TECHNICAL TERMS

7. Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. **Wireless telephone**: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

   b. **Digital camera**: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a

Application – Page 3

computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

 c. **Portable media player**: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

8. Based on my knowledge, training, and experience, I know that electronic devices, such as wireless telephones, can and often do store information for long periods of time. Similarly, things that have been viewed via the internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

9. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the SUBJECT DEVICE was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence is on the SUBJECT DEVICE because:

 a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a

**Application – Page 4**

deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.     Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.     A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic device was used, the purpose of its use, who used it, and when.

d.     The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on an electronic device is evidence may depend on other information stored on the device and the application of knowledge about how a device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.     Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

f.     How the electronic device was used; data that was sent or received; and other records that indicate the nature of the offense.

10.    *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the SUBJECT DEVICE consistent with the warrant. The examination of the SUBJECT DEVICE may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

11.    *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant

**Application -- Page 5**

does not involve the physical intrusion into any premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## PROBABLE CAUSE

12. On September 13, 2023, HSI Texarkana Acting Resident Agent in Charge (ARAC) Chet Sanford, was contacted by a law enforcement officer regarding four women that had been reported behaving suspiciously in the Road Ranger convenience store (hereafter, store) on Highway 8 in New Boston, Texas. ARAC Sanford was advised that the women had been observed near a red tractor-trailer at the store and in the company of the truck's driver, Juan Francisco QUINONES. The initial information received by ARAC Sanford was that one or more of the females may have been a juvenile, and that there was concern that the women may possibly be victims of human trafficking.

13. ARAC Sanford conducted records checks for Juan Francisco QUINONES and determined that he was the subject of multiple Department of Homeland Security (DHS) records identifying him as a smuggler of illegal aliens. ARAC Sanford directed me to travel to the store and assist the New Boston, Texas, Police Department (NBPD) in their investigation of the matter.

14. I arrived at the store at approximately 1:00pm and made contact with NBPD Detective Rusty Hill behind the store where tractor-trailer parking is provided. Detective Hill was in the presence of two NBPD uniformed officers and another

Application – Page 6

Detective near a red tractor-trailer. I noticed a man, later identified as Juan Francisco QUINONES, sitting handcuffed near the back tires of the truck portion of the vehicle.

15. Detective Hill advised me that he had observed surveillance video from the store that indicated that the four women and Juan Francisco QUINONES had gotten out of the red truck and entered the store. He also advised me that the four women were in the store with a female officer who was translating for them.

16. I approached Juan Francisco QUINONES and identified myself to him as a Special Agent with Homeland Security Investigations, and an immigration officer. I also presented my credentials for his review. I then read to him his *Miranda* rights in the Spanish language.

17. After clearly stating to me that he understood his rights and was willing to speak with me at that time, I asked him about his travel itinerary and the four women inside the store. Juan Francisco QUINONES told me that the women had approached him in the store and asked him about clothing there in the Spanish language. When asked, he stated to me that the women had not been in the tractor-trailer he was driving, that all items in the truck belonged to him, and that there was no property in the truck that belonged to a woman.

18. I then asked Juan Francisco QUINONES for permission to search his truck in the Spanish language, and he responded, "Claro" [of course]. After initially telling me that there was no money on his person or in the truck, he stated that there was $8,000 in the truck that he had earned and was going to use to buy a car in Laredo, Texas. He told me that the money was located under some shirts.

**Application – Page 7**

19. Detective Hill and I then searched the truck, finding a small purse containing feminine hygiene products and a bundle of United States currency in a rubber band under some shirts in the sleeper area of the truck. Detective Hill provided me with a plastic evidence bag bearing number A0031754470, in which I placed the bundle of cash and sealed the bag in his presence. I secured the evidence bag in my government-owned vehicle and locked the door. I later secured the sealed bag in the evidence storage room at the HSI Texarkana office.

20. After searching the truck, I again spoke to Juan Francisco QUINONES and explained to him that making a materially false statement in the course of a Federal investigation may constitute a crime, that feminine products were discovered in the truck, that I was aware of his previous encounters involving alien smuggling, and that officers had reviewed video showing the four women getting out of his truck. He then admitted that he believed that the four women were illegally present in the United States, that he was transporting them from San Antonio, Texas, to Lexington, Kentucky, for a total of $2,000, and that it was not allowed and dangerous to transport individuals in the sleeper area of the truck. At my request, Juan Francisco QUINONES again admitted to these facts a short time later in the presence of ARAC Sanford, who arrived at the store after me.

21. Detective Hill identified a cellular telephone (hereafter, SUBJECT DEVICE) located in the tractor-trailer as belonging to Juan Francisco QUINONES. I secured the SUBJECT DEVICE in my government-owned vehicle.

**Application – Page 8**

22. I later walked to the store and located the four women inside in the presence of Texas Department of Public Safety (DPS) Special Agent Briscoe Davis and a female Texarkana Independent School District Police Department Officer.

23. I identified myself to the four women, later identified as Alma Delia Rodriguez-Rios, Yelmi Lima-Contreras, Jenifer Ramiro-Ortigoza, and Ana Gabriela Lopez-Flores, per their Mexico Voter Registration Cards, and provided my credentials for their review.

24. When asked, each of the women stated that they were illegally present in the United States. They also told me that they were citizens of Mexico who had entered the United States approximately one week prior near Nuevo Laredo. They stated that they had met the driver of the truck after traveling approximately three hours from the border and were directed to travel with him. They stated that $16,000 had been paid for each of them to be transported from the Mexico state of Puebla to Chicago, Illinois.

25. Juan Francisco QUINONES, the SUBJECT DEVICE, the undetermined amount of United States currency, and the four women were then transported to the HSI Texarkana office for processing. Juan Francisco QUINONES was found to be in possession of valid Permanent Resident Card A74 378 419, identifying him as having been born in Mexico.

26. At the HSI Texarkana office, Juan Francisco QUINONES was again advised of his *Miranda* rights in the Spanish language by ARAC Sanford utilizing ICE Form 73-025, which he signed indicating that he understood those rights and was willing to answer questions.

**Application – Page 9**

27. Thereafter, Juan Francisco QUINONES advised ARAC Sanford that he had transported illegal aliens on two prior occasions for the same individual for whom he was transporting the illegal aliens on September 13, 2023. Juan Francicsco QUINONES voluntarily showed ARAC Sanford a contact in the SUBJECT DEVICE which he claimed was the individual on whose behalf he was transporting the women.

28. The SUBJECT DEVICE has remained secure, unaccessed, unaltered, and in the custody of law enforcement at all times since it was seized on September 13, 2023. The SUBJECT DEVICE is currently located in the evidence storage room at the HSI Texarkana office, which is located in Miller County, Arkansas.

## CONCLUSION

29. Based on the forgoing, I submit that there is probable cause to believe that Juan Francisco QUINONES has committed a violation of 8 U.S.C. § 1324, specifically, that he knowingly and in reckless disregard of the fact that aliens had come to, entered, and remained in the United States in violation of the law, transported such aliens within the United States in furtherance of such violation of law and conspired to do so with others.

30. I further submit that there is probable cause to believe that the SUBJECT DEVICE contains evidence of Juan Francisco QUINONES' involvement in this illegal activity.

Respectfully submitted,

_____
Special Agent Jeremy Ridenour
Homeland Security Investigations

Subscribed and sworn to before me on September 19, 2023,

_____
HON. J. BOONE BAXTER
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF TEXAS

## ATTACHMENT A

## DESCRIPTION OF SUBJECT DEVICES TO BE SEARCHED

The property to be searched is a ~~black~~ blue (9/19/23) Apple iPhone, model number unknown, bearing IMEI number 354876501574359, hereinafter the SUBJECT DEVICE, which is being held in the custody of the Homeland Security Investigations, Texarkana Resident Agent in Charge Office, in Texarkana, Miller County, Arkansas, in the Western District of Arkansas, two photos of which follow:



**Attachment A – Page 1**


This warrant authorizes the forensic examination of the SUBJECT DEVICE for the purpose of identifying the electronically stored information described in Attachment B.

Attachment A – Page 2

## ATTACHMENT B

1. All records and information on the SUBJECT DEVICE described in Attachment A that constitute evidence, fruits, and/or instrumentalities of violations of **8 USC § 1324** by Juan QUINONES and/or others, including but not limited to:

    a. Pictures, photographs, video, or similar items;

    b. GPS or travel information showing the locations where the phone and/or the person utilizing the phone has travelled to or from;

    c. Lists of customers and related identifying information;

    d. Types, amounts, and prices of undocumented aliens trafficked as well as dates, places, and amounts of specific transactions;

    e. All bank records, checks, credit card bills, account information, and other financial records that may reveal the payment of human smuggling or transportation of illegal aliens.

    f. Any information related to sources of contacts to include but not limited to: aliens smuggled, payers for those smuggled, stash house locations and/or operators, guides, drivers, facilitators, or other coconspirators (including names, addresses, phone numbers, or any other identifying information); and

    Any information recording Juan QUINONES' schedule or travel up to the date of his arrest.

2. Evidence of user attribution showing who used or owned the SUBJECT DEVICE at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created

**Attachment B – Page 1**

or stored, including any form of computer or electronic storage (such as flash memory, SIM card, or other media that can store data) and any photographic form.

Attachment B – Page 2